CHILDRESS & MULLANPHY, Plaintiffs in Error, *vs.* CUTTER, Defendant in Error.

1. By the custom of Paris or French law, real estate owned by either party at the time of marriage, did not enter into the community.

2. A marriage contract, purporting to create a community according to the custom of Paris, contained this clause: "The said future spouses take each other, with their property and all the rights now actually belonging to them, and also those which may fall to or appertain to them, &c., which property shall wholly enter into the community," &c. *Held*, the words "which property, &c.," must be understood as applicable only to that which came to them during marriage.

3. By the Spanish law, which formerly prevailed in this State, if a husband or wife married a second time, the property which he or she acquired from a former spouse, either directly or by inheritance from any of the children of the first marriage, became the property of the surviving children of the first marriage, and the spouse who married again only had the usufruct of it during life.

4. There was an exception to this general rule, in favor of women becoming widows before the age of twenty-five years. But a widow who claims the benefit of this exception, must prove herself within it; otherwise the case will be determined according to the general rule.

5. Under the twelfth section of the Territorial act of July 4th, 1807, upon the death of a person who had acquired an estate of one of his parents, the estate descended exclusively to his blood, on the part of the parent from whom it came to him.

6. A certified copy of any record or public paper, by the officer intrusted with its custody, is evidence, if the original would be; but such documents are not evidence of matters stated in them, which do not belong to the transaction which the officer was required to record.

7. Church registers are not admissible in evidence, except by special statute, unless they are, by the civil law of the country or State where kept, recognized as documents of an authentic and public nature.

8. Recitals in such registers are not admissible as evidence of pedigree.

## *Appeal from St. Louis Circuit Court.*

THIS was ejectment, in the St. Louis Circuit Court, brought by Cutter on the 1st of November, 1845, for a tract of one by forty arpens of land in the Common Fields adjacent to St. Louis, stating it to be the same tract formerly conceded to Louis Lirette and by him sold to Jno. B. Vifvarenne, being U. S. survey number 1479 in said Common Fields. Childress was the tenant of Bryan Mullanphy, of a lot of twenty-five by one hundred feet. Mullanphy caused himself to be a co-defendant, and on the 10th of January, 1850, a verdict was rendered against the defendants for two fifteenths of said lot of twenty-five by one hundred feet. A motion was made for a new trial, and overruled; and defendants appealed.

The plaintiff gave in evidence documents as follows :

1st. A concession on 17th July, 1769, of St. Ange to Louis Lirette, of a tract of one by forty arpens of land, situated in the prairie opposite the mound; bounded on one side by widow Mareschal, and on the other by Condè.

2nd. A survey by Duralde, taken from Livre Terrien No. 2, of one by forty arpens, for Louis Lirette, in the prairie that touches the village (St. Louis); bounded on one side by the domain of the king, and on the other by Moreau. This was made between 1770 and 1772.

3d. A conveyance by Louis Lirette before the lieutenant governor, Piernas, to John Baptiste Vifvarenne, dated 20th August, 1774, of one by forty arpens; bounded on one side

by the widow Mareschal, and on the other by the domain of the king or the land of Condè.

4th. A confirmation by the recorder, being the usual tabular statement in his report. The quantity is one by forty arpens, and it states that notice to the recorder was by Lirette's representatives. The decision is in these words, "Confirmed forty arpens to be surveyed."

5th. United States survey No. 1479 of the tract conveyed to Lirette, and confirmed as above; bounded north by Moreau, and south by Mullanphy, under Provenchère, executed on 19th October, 1826.

6th. Certificate of marriage of John Baptiste Vifvarenne and Genevieve Cardinal, on the 6th August, 1777.

7th. Certificate of burial of said Genevieve, on the 2nd of November, 1792.

8th. Certificate of baptism of Louis Vifvarenne, son of J. B. Vifvarenne (spelled Wivaren) and Genevieve, on 15th August, 1780.

9th. Certificate of burial of an infant of "Wivaren," aged fourteen months, on 1st January, 1781.

The plaintiff claimed under sundry deeds from persons representing themselves heirs of J. B. Vifvarenne, and proved that J. B. Vifvarenne died many years before his wife died. He also gave evidence, tending to prove that Louis Vifvarenne, son of J. B. Vifvarenne, left St. Louis about the year 1800, and went to the lower country. He then gave depositions of sundry witnesses, stating, that at about that time, a person answering the description of Louis Vifvarenne, son of J. B. Vifvarenne, came to the parish of St. Landry, near Opelousas, in Louisiana, and remained there till he died, in 1813; that he went by the name of Louis Cardinal, and was generally known only by that name; said he was from St. Louis, and mentioned to a person, on one occasion, that his name was Vifvarenne. Other circumstances were given in evidence, tending to show that he was Louis Vifvarenne, son of J. B. Vifvarenne.

1. The defendants gave in evidence the marriage contract between John Baptiste Vifvarenne and Genevieve Cardinal, dated the 5th August, 1777. It provides, that they will perform the ceremony of marriage, as soon as either requires it of the other : " That the said future husband and wife may be one and common in all property movable and acquisitions immovable, according and in conformity to the ancient custom established in this colony, to which they subject themselves in respect to this contract ; the said future husband and wife shall not be bound for the debts of each other, accrued before the celebration of said marriage ; and should there be any, they shall be paid by him or her who contracted them, out of his or her property, without the other being responsible, or his or her property.

" The said future husband and wife take each other, with their property and rights actually belonging to them, and that which shall come, descend, or belong to them hereafter, whether by inheritance, donation, legacy, or otherwise ; which property, from whatever source it may come to them, shall enter wholly (par le tout) into the community, without any reservation."

The contract provides, that said Vifvarenne endows her with the sum of six hundred livres, to be a charge on all his property. It then further provides, that the survivor of them shall be entitled to four hundred livres out of the property of the community.

Defendants also gave in evidence the following :

2. Certificate of baptism of John Baptiste Vifvarenne, son of said J. B. Vifvarenne and Genevieve Cardinal, showing that the ceremony was performed on the 3d of May, 1779.

3. Certificate of baptism of Francis Vifvarenne, also a son of J. B. Vifvarenne and Genevieve, showing that he was born on the 6th of April, 1782.

4. The deed of Toussaint Mareschal and Charles Mareschal (sons of said Genevieve, by Jacques Mareschal by second marriage) to Pierre Chouteau, conveying, as heirs of Gene-

vieve Vifvarenne, their mother, the said one by forty arpens of land, dated 11th October, 1817.

5. The deed of said Chouteau and wife to John Mullanphy, dated 30th October, 1819, conveying to him, in fee, one hundred and twenty arpens, composed of the Lirette field lot, in question in this suit, and the two adjoining on the north; to wit, one in the name of Moreau, and the other in the name of Vien, the original claimants. This deed was acknowledged and recorded, 1st November, 1819.

6. Inventory and appraisement of the property of Genevieve Cardinal, widow of John B. Vifvarenne, and her two minor children. This document is dated 19th August, 1782. It sets forth that it was done by the lieutenant governor, Cruzat, and in consequence of said Genevieve's having left the place. (Plaintiff objected to the admission.)

7. Sale of the property, real and personal, of said Genevieve and her two children, contained in said inventory and appraisement, on the 6th of October, 1782, by the same lieutenant governor, to pay the creditors of said Genevieve.

8. An extract from the parish register of St. Landry, in Louisiana, as follows: "In the year 1813, and the 24th of the month of August, I, the undersigned, Michael Bernard Barriere, priest, officiating in this parish of St. Landry of Opelousas, buried in the cemetery of this parish, the body of Louis Vifvarenne, an adult of about thirty-three years, native of St. Louis, of Illinois, and natural son of Louis Vifvarenne and Margaret Metive. He died from sickness, and at the house of Pierre Bellevue, in the Grand Prairie. He was not married, died poor, and did not receive the sacraments, not being aware that he was going to be sick. He lived in this parish about twelve years."

The present priest of that parish and keeper of its records swears to the above copy, and the custom of the church, to keep such registers, &c. In the margin of the above entry on the parish record, is a memorandum, as follows, in the same

handwriting: "Louis Vifvarenne. He was better known under the name of Louis Cardinal."

It was proved, that the whole entry was in the handwriting of Barriere, then the parish priest, who has since died.

The defendants gave evidence tending to prove, that Genevieve, widow of J. B. Vifvarenne, married Jacques Mareschal soon after the death of Vifvarenne; that the two Mareschals, who made the deed to Mullanphy, were her only heirs : that as early as 1820, at least, Mullanphy built a brick house on the south line of the Vien field lot and north line of the Moreau field lot, being partly on both of those tracts, and surrounded the same by an enclosure, the eastern part of which was on the eastern line of the field lots ; that the house stood back from the eastern line a hundred feet, more or less, and the enclosure was extended south, then, or in a year or two after, so as to reach the Lirette field lot and take in a portion of it. The testimony, as to its extent to the south, was conflicting ; some witnesses thinking it comprehended the common field lot in question, in whole or in part ; and others, that it did not.

9. The defendants also gave in evidence the confirmation, by the board of commissioners, on 18th November, 1809, to John Mullanphy, of two by forty arpens, being the common field lot lying immediately south of and adjoining the south field lot, which is in controversy in this action.

It appeared in evidence, that John B. Vifvarenne had two sisters and no brothers : that one of those sisters married Joseph Labuxiere, and had numerous issue, from some of whom, in the second or third generation, the plaintiff derived title : that the other sister married Sans Souci, and had issue still living, whose title was not in the plaintiff.

It further appeared that Genevieve Cardinal had a number (six) of brothers and sisters, all of whom but one left issue, so that Louis Vifvarenne or Cardinal, who died near Opelousas, if he were the son of Vifvarenne and Genevieve Cardinal, had collateral kindred through his two paternal aunts, and also

through his maternal uncles and aunts, and also left two half brothers, by the mother's side.

The defendants then asked the following instructions :

1. If the jury find from the evidence, that the marriage contract, read in evidence in this case, by defendants, was executed by John Baptiste Vifvarenne and Genevieve Cardinal, at the time of its date, and that the said John Baptiste and Genevieve were immediately thereafter married, according to the stipulations of said contract, at St. Louis, in the year 1777, they will then consider the property owned by said Vifvarenne, at the time of the marriage, as put into and forming a part of the community created by said contract, and that the land in controversy, if it then belonged to him, became, also, a part thereof; and further, that by virtue of the community so created, the one undivided half of said land, in fee, was the property of said Genevieve, if the jury find that said Vifvarenne died under the Spanish government, in the province of Louisiana, leaving said Genevieve, his widow, surviving.

2. If the jury find that the said marriage contract was made before the lieutenant governor, by said John Baptiste Vifvarenne and Genevieve Cardinal, at St. Louis, in the year 1777, and that thereafter, in the same year, they were married ; and that afterwards, and during the existence of the Spanish government in Louisiana, said Vifvarenne died, and Genevieve, his widow, married Jacques Mareschal ; that she died in 1792, leaving three children by said Mareschal, and one surviving, by her first husband, Vifvarenne ; and that said son, by Vifvarenne, died in 1813 without issue,—then the jury are instructed, that all interest or title in the land in question, belonging to said Genevieve, at her death, descended in equal portions to her said four children, and all the interest and title in said land, owned by her son by Vifvarenne, which descended to him from her, upon his death, passed, in equal portions, to the children by Mareschal, or to such of them as were then living.

3. If the jury find that J. B. Vifvarenne, the father, left

several children at the time of his death, and that he died while the Spanish government existed in Louisiana, then all lands owned by him at the time of his death, and which could descend to his heirs, vested in those children in equal portions ; and if such children, or any of them, died before their mother, while the Spanish authority remained in force, then the portion of such child or children passed to and vested in the mother.

4. If Louis Cardinal, *alias* Louis Vifvarenne, was the lawful son of John Baptiste Vifvarenne, and if he died in the year 1813, owning an interest in the land in question, descended to him as heir of his father, without leaving issue, or father or mother or wife surviving, then such interest passed to his collateral kindred ; that is, his uncles and aunts, both on father's and mother's side, if any, surviving, and to the issue of such as were dead, in equal portions ; such issue to take such portion as their ancestor, the said uncle or aunt, would have taken, if alive.

5. That the inventory and appraisement, purporting to have been made on the 19th of August, 1782, of the property of Genevieve Cardinal, wife of the deceased, John Baptiste Vifvarenne, and of her two minor children, is evidence that she then had two children living, if the jury find the same was executed by the proper Spanish authority, at its date.

6. That the document given in evidence, purporting to be a sale, by the lieutenant governor, of the property of Genevieve Cardinal and her two minor children, is evidence tending to establish the fact that there were two minor children of said Genevieve then living, if the same was duly executed before the proper Spanish authority, at its date.

7. That the document given in evidence, as a certificate of interment, made by Pierre Bernard Barriere, is evidence tending to show that the said Louis Vifvarenne, therein mentioned, was the natural son of John B. Vifvarenne, by Margaret ; provided, the jury believe, from the evidence, that the original entry, of which said document purports to be a copy, was made at the time of its date, in the register of the parish, by the officiating

priest of that parish, who performed the burial service on the interment of said Louis.

8. If the jury find from the evidence, that the deed, given in evidence, purporting to be the deed of Pierre Chouteau and wife to John Mullanphy, was duly executed by the grantors therein, at its date, and that it embraces the forty arpent tract, of which the land in controversy in this suit is a part, and that said Mullanphy and those claiming under him have had possession of a part of said forty arpent tract since the year 1819, for twenty years before the commencement of this suit, under said deed, and claiming the whole, then there can be no recovery in this action in favor of the plaintiff, for any share or interest in the land sued for in this action, which, at the commencement of said twenty years' possession, was owned by a person then residing in the Territory or State of Missouri, and not then a minor or married woman.

9. That possession of part of a tract of land, under a deed for the whole, with a claim to the whole, is such possession as will bar the actual owner by a lapse of time under the statutes of limitation, in force from the year 1818 to the present time, in Missouri.

10. That the plaintiff cannot recover in this action, unless it appear, to the satisfaction of the jury, that he, the plaintiff, his ancestor, predecessors, or grantor was seized or possessed of the premises in question, within twenty years before the commencement of this action.

11. That if the jury find, as in the fifth instruction asked by defendants, they are then instructed that said document therein mentioned, as an inventory and appraisement, is evidence tending to prove that John Baptiste Vifvarenne, the father, was dead at the date of said inventory, viz., in the year 1782.

Of the said instructions, the court refused to give all except the eighth and ninth; to which refusal of the court the defendants excepted.

The plaintiffs then asked the following, viz. :

1. If the jury believe from the evidence, that John Baptiste

Vifvarenne left more than one child surviving him, and that said child died before his or her mother, and after his father, and that Genevieve Cardinal was married the second time, to Jacques Mareschal, she was bound, on such second marriage, to restore the inheritance to the children of her first husband, living at the time of such second marriage, if the jury shall believe the premises in question were originally derived from said John Baptiste Vifvarenne, and no estate of inheritance in the case, supposed in this instruction, rested in said Genevieve after she became the wife of said Mareschal.    Such is the general rule, and if it is claimed by the defendants, that John Baptiste Vifvarenne died before his wife attained the age of twenty-five years, and that, therefore, she could take from any deceased child or children of the first marriage, the jury are instructed that this is one exception to the general rule ; and it is for the defendants to prove the facts upon which the exception is founded ; and in the absence of any proof satisfactory to the jury on this point, they will disregard the exception, and find according to the general rule.

2. If the jury believe from the evidence, that John Baptiste Vifvarenne was seized of the premises in question before his marriage with Genevieve Cardinal, and that he died before his said wife, then, upon his death, the estate descended to his heirs ; and if the jury believe Louis Vifvarenne was his only surviving child, and that he died in 1813, or about that time, unmarried, and not having had any legitimate children, then the premises went to his paternal kindred ; and if the jury believe that the wife of Joseph Labuxiere, the elder, and the wife of Sans Souci, were aunts of said Louis, and his nearest kindred on his father's side, they or their heirs took the estate in exclusion of any brothers of the half blood on the mother's side ; and if the jury believe that Pierre Pallardie, Antoine Pallardie, Noel Pallardie, Michael Pallardie, Mary L. Pallardie, and Celeste Thibeau were descendants of said Joseph Labuxiere and wife, and their grand-children ; and that Mary Lamarche, Denise Lamarche, and John Baptiste Dorlaque were also de-

scendants and great grand-children of Catharine, wife of said Joseph Labuxiere, senior, and that Mary Janis, Andrè Beauchemin, Joseph Beauchemin, and Louis Beauchemin were also great grand-children of said Catharine and her husband, Joseph Labuxiere; and that Gabriel Labuxiere, Eugene Labuxiere, Henry Labuxiere, Joseph Labuxiere, Marcellette Letamps, and Odille Letamps were also descendants and grand-children of said Catharine and Joseph Labuxiere, and that deeds, given in evidence from these persons, were duly executed by them and by the husbands of said Marcellette and Odille, to the plaintiff in this suit, they will find for the plaintiff such portion of the premises of which defendant was in possession, as these persons would be entitled to as lineal descendants; and assuming the said Catharine and wife of said Joseph, if she had survived said Louis Vifvarenne, would have been entitled to one half of said premises, that in ascertaining said portion, if they believe Antoine, son of the said Catharine last mentioned, died unmarried, intestate, and without children, the portion he would have taken went to his brothers and sisters and their descendants; that if they believe Charles Beauchemin has been absent from the State more than seven years, and no tidings have been had of him, his death will be presumed, and his share go to his brothers and sisters; and if they believe Louis Beauchemin dead, intestate, and without children, his share went to his wife and brothers and sisters.

3. The inventory and account of sale of the effects of John Baptiste Vifvarenne, or his widow, are not evidence of any facts stated therein, as to the survivorship or number of children of John Baptiste Vifvarenne.

4. The certificate of burial from the parish of St. Landry, Opelousas, in Louisiana, is not to be received by the jury as evidence of the question of legitimacy of Louis Vifvarenne.

5. To enable the defendant to avail himself of the statute of limitations, it must affirmatively appear to the jury, by proof, that his possession of the land in controversy, or of a part thereof, with a claim to the whole, as already stated, or that of

those under whom he claims, commenced and continued, without interruption or intermission, for twenty years before the commencement of this suit, under a deed purporting to convey the legal title thereto ; if, therefore, the jury shall believe from the testimony, that defendant, or those under whom he claims, had not such a possession of the land sued for as commenced and continued without intermission for twenty years before the beginning of this suit, under a deed purporting to convey the title thereto, they will find for the plaintiff, on the defence raised under the statute of limitations. Which instructions the court gave ; to the giving of which, and each of them, the defendants excepted. The court having refused to give instruction numbered three (3), asked by the defendants, modified and gave the same, with an addition to it, as follows : " That if the jury find that J. B. Vifvarenne, the father, left several children at the time of his death, and that he died while the Spanish government existed in Louisiana, then all lands owned by him, at the time of his death, and which could descend to his heirs, vested in those children in equal portions ; and if such children, or any of them, died before their mother, while the Spanish authority remained in force here, then the portion of such child or children passed to and vested in the mother, absolutely, except as stated in the instruction next following" : to the giving of which defendants excepted. This instruction was followed by No. 1 of plaintiff's, as explanatory of it.

*Spalding & Shepley*, for appellants.

I. By the marriage contract of John Baptiste Vifvarenne and Genevieve Cardinal, the wife took an interest of one half in the land in question, absolutely. 10 Mo. Rep. 312. *Broussard* v. *Bernard, et al.,* 7 Lou. Rep. 220. 3 Vol. Recop. lib. 10, tit. 4, law 6. 3 ib. p. 425, lib. 10, tit. 4, laws 1, 2, 3, &c. 2 Coutume de Paris, pp. 2, 3, 40, 41. Analyse du Droit Français, p. 654, art. 229, p. 344, 351, 350, 528. 1 Science des Notaires, 261, 263, 291. Louisiana Code, Articles 2314, 2315. 17 La. 238. 7 La. 222. 1 White, p. 61, sec. 2. 3 Febrero, p. 117, No. 6, p. 129,

Nos. 23, 24, 25, and 26 ; p. 138, Nos. 44 and 47 ; p. 140, Nos. 48 and 49 ; p. 141, No. 50 ; p. 153, No. 8.

II. On the death of J. B. Vifvarenne, his half of the property descended to his issue.

1 vol. Febrero, p. 200, Cap. 6, secs. 1, 2, &c., that descendants inherit if there be no will. 1 White, 115 (Asso y Manuel, 120–1–2) ; 3 vol. Partidas in Spanish, 248 (*Post.* 6 tit. 13, law 3 ) to same effect. 4 Febrero, 42, Nos. 17, 18, &c.

III. On the death, under the Spanish government, of any of Vifvarenne's children without issue, their mother, if living, inherited. Such was the general law.

1 Febrero, 89, No. 54, that father and mother, grandfather and grandmother, &c., in the ascending line, are heirs, instead of collaterals. 3 vol. N. Recopilacion, p. 524 (lib. 10, tit. 20, laws 1 and 2. 1 White, 116. Asso y Manuel, 120–1–2.

IV. On the second marriage, if Madame Vifvarenne became a widow over twenty-five years of age, she was bound to restore what came to her from her husband, directly or by inheritance from any of his children, to the surviving children or issue ; but this restoration did not take place till her death, as she had a life estate in the property, nor did it then take place in favor of any others than the *descendants* of the first husband.

1 Febrero, 235, chap. 8, No. 1. Ibid, No. 2. 3 Febrero, p. 407, No. 2. Ibid, Nos. 3, 4, and 8. 2 Febrero, 200, No. 1977. Ibid, p. 409–11–12–13. Ibid, p. 408, No. 4. Ibid, p. 203, No. 1993 (L. Lib). Ibid, p. 414, No. 27 & No. 28. 3 vol. Recop. Lib. 10, Tit. 4. 2 Febrero, p. 415, No. 31. 7 Mart. Rep. (N. S.) 655, 668–9. 4 Mart. Cond. Rep. 391. *Deblanc* v. *Landry*, 6 Mart. N. S. 31. 3 Cond. 732.

V. The first instruction given for the plaintiff below is erroneous : 1st, in asserting that Madame Vifvarenne was bound to restore the inheritance to the children of the first husband, *upon, and at the time of her second marriage.* 2nd, in assuming that no estate of inheritance vested in said Genevieve, after her *second marriage.* 3rd, in assuming that even if all of J. B. Vifvarenne's children died before their mother, that still

the property could not vest in her nor descend from her. 4th, in assuming that a lawful child of J. B. Vifvarenne did survive the said Genevieve; and 5th, in assuming that there must be such restoration of the property, if it was derived from J. B. Vifvarenne, no matter how derived. 6th, in declaring that the restoration must be to the child or children, whether *legitimate* or not. 1 Febrero, p. 200, No. 1, that the *legitimate* descendants inherit, and page 98, No. 69, and illegitimate do not. 7th, in assuming that we, the defendants, were bound to prove an exception to the general law.

VI. On the death of Louis Cardinal, *alias* Vifvarenne (if he was the lawful son of J. B. Vifvarenne and Genevieve, his wife), his estate in the land in question, so far as derived from his mother, went to his half brothers, the two Mareschals; and so far as derived from his father, it went to his uncles and aunts, or their descendants, by both father and mother's side. 1 Terr. Laws, 125, secs. 9, 10, 11, 12, and 14, at pages 130–1. Ibid, page 128, secs. 6, 7.

The twelfth section is a provision applicable to cases where there are *half bloods*, and the question is between them and other claimants of the whole blood, for the sole purpose of excluding *half bloods* of the one side from property descended on the other side. It is not an enactment that property shall descend to those only of kin to a remote ancestor from whom it originally came.

There are no *half bloods* back of the intestate; they are all *whole bloods*, as to him; his uncles and aunts, by mother's side, are *whole bloods*, as much so as on the father's side.

VII. The inventory and appraisement of the property of Genevieve Cardinal, widow of J. B. Vifvarenne, and of her two minor children, and also the judicial sale of the same by the lieutenant governor, in 1782, are, each of them, evidence tending to establish the fact that there were, then living, two minor children of said Genevieve and J. B. Vifvarenne. 1 Greenl. Ev. p. 134, secs. 115 and 116, that entries by persons in discharge of duty, official or professional, are evidence.

3 Barn. & Ald. 890, an attorney had endorsed on a paper that he had served it; after his death, held that this was evidence of service. Buller's *Nisi Prius*, 282, an entry of a book-keeper, deceased, admissible. 10 East. 109; 1 Esp. 328; 6 Mees. & Wells, 153. In 10 East. above, it was held that the account book of the surgeon proved the day of birth of the child. 8 Wheat. 326, memorandums made in the course of business, are evidence; *a fortiori*, the acts of a public officer are admissible; 1 Greenl. Ev. 134, secs. 115, 120. The opinion of Le Blanc, J., at p. 120, in 10 East. is to the point.

VIII. Said inventory is also evidence, that J. B. Vifvarenne was dead, at its date, and therefore the eleventh instruction of defendants should have been given. The inventory was officially and formally made before the lieutenant governor.

1. The bare fact of its existence, so made and found among the records of the country, proves the *right* and *duty* of the governor to make it.

2. Being a legal and official act, credit is due to it. 6 Pet. 724, 728, 729.

3. The authorities referred to, under the next head, show that said document was proper evidence of matters of *pedigree*, and *pedigree* embraces the fact of *death* as well as *birth*, &c.

IX. The certificate of interment of Louis, by the parish priest, stating that he was the *natural* son of his father, *Louis* Vifvarenne, and a half breed woman, named Margaret, is evidence tending to prove that he was an illegitimate child; and the seventh instruction of the defendants should have been given. 1 Greenl. Ev. 117, secs. 104, 105, 107, "Pedigree embraces not only *descent* and relationship, but also the facts of *birth, marriage* and *death*, and the *times* when these events happened. Also, identity, 5 Har. & John. 51, at p. 55–6. 4 Mason 268, recital in a deed, other than a family deed, corroborated by possession, admitted to prove heirship: Hubback, 514, 516, 517, 518, 519, 653, &c.

Depositions of deceased witnesses, taken between other par-

ties, and with whom the new parties are no way privy, may come in as hearsay evidence of pedigree : 4 Wash. C. C. 186. 3 Wash. C. C. 243.

8 John. 128, 131, 5 Cowen, 237, hearsay of those not *relatives*, is admissible to prove pedigree. 1 Harr. & McHenry, 281 ; 5 Har. & John. 51 ; 1 Wash. 124 ; 2 Hen. & Mun. 193. 10 Pick. 515, letters of administration prove death. 15 John. 226, birth and marriage proved by town records of another State.

*W. L. Williams*, for respondent.

I. The first point raised by plaintiff below is this : The premises in question being the sole property of Vifvarenne, at the period of his marriage with Genevieve Cardinal, on the dissolution of the community, by his death, the land descended to his children.

The marriage contract between those parties did not at all change the then existing law, so far as this property was concerned. The law then prevailing has been well laid down by this court, and settled in Louisiana : *Dawson* v. *Ripley*, 17 La. Rep. 238. *Picott's case*, 10. Mo. R., 312.

II. Upon the death of Louis Vifvarenne, this estate went to his paternal relatives, to the exclusion of his brothers and sisters of the half blood. He died in 1813 or 14, and the succession must be determined by our territorial act, 1807 : 1 Vol. T. L. p. 130, particularly secs. 12, 14.

The Mareschals are excluded from inheriting from Louis Vifvarenne, the property that came to him by his father. In *Deu* v. *Jones*, 3 Halsted, 340, where statute is similar, court held the construction contended for. His aunts, Mesdames Labuxiere and Sans Souci, or their descendants, would take the estate.

III. The third instruction asked by defendants, and given, and the first asked and given, on the part of the plaintiff below, embrace this proposition.

That if more than one child survive the father, and one of these die before the mother, she would inherit, unless she had

married the second time, not being a widow under twenty-five years of age, in which case she was bound to restore the inheritance coming from the first husband, to his surviving child or children. If, at the time of the death of any such child, the mother were married, she could not inherit, but his portion descended to or passed to his surviving brother or brothers and sisters.

The general rule of descents, under the Spanish law, and usually in countries adopting the civil code, is not disputed. The estate goes, first, to descendants ; in default of them, to ascendants, and if no relatives in the ascending line, then to collaterals. In the case supposed, the mother would have inherited, if she were under no disability, created by the laws of Spain. She was, however, married the second time, was twenty-five years old, and not a widow, under twenty-five, in 1784 ; and if the youngest child (François) survived his father, he was, in all probability, dead before this second marriage. If so, upon her marrying Mareschal, she was bound to restore the inheritance, and by law it became and was vested in Louis, the only surviving child. The authorities cited, leave no doubt, it is submitted, as to this rule of the Spanish law. 3 Mart. R. 446. 6 ib. N. S. 38. 7 ib. 665. Ib. 10 tit. 4 Lex. 7 White's Compilation.

The second instruction given for plaintiff below, however, presents an exception to this rule, and correctly states the *onus probandi*.

It has been said, that this rule related only to *arras*, and not to property *inherited*. For the rule as to *arras*, as well as other property, see the citations from the Institutes of ———, translated by Judge Johnson, of Trinidad, and found in White's Compilation, from which the references are made.

IV. The instruction given, as to the effect of the inventory and account of sale of the property of the widow, was correct.

V. The certificate of burial, from the parish of St. Landry, Opelousas, was not admissible for any purpose ; much less could any statement affecting the legitimacy of the decedent,

contained in said certificate, be admitted. This comes from the State of Louisiana, and is not even shown to be evidence there. Before a paper of this kind, from a foreign State, can be read (if it ever is admissible), it must be proved that, by the law of the State or country whence it comes, such certificate is evidence. Our statute applies only to such evidence within our own State, and the admission of foreign certificates rests upon the general common law rules of evidence. Hubback, 492.

SCOTT, Judge, delivered the opinion of the court.

1. It was maintained in argument by the appellants (defendants below,) that by the marriage contract between J. B. Vifvarenne and Genevieve Cardinal, she, the wife, took an interest of one half in the land in question, absolutely. By the Spanish law, which prevailed here at the time of this marriage, by mere operation of law, without any stipulation or agreement, a community or partnership was established between husband and wife of all their estate, both real and personal. At the dissolution of this partnership by death, after the payment of the debts incurred during its existence, the survivor took back the property he or she had at the time of marriage, and the share of the deceased went to his or her heirs. If it was real estate, it was taken in kind, and in value, if personal estate. By the custom of Paris, or French law, as it is called, a like community was created with regard to the personal estate of the husband and wife; but the real estate owned by either party, at the celebration of the marriage, did not enter into the community. The words of the contract of marriage, that "the said future spouses shall be one and common in all goods movable and acquisitions immovable, according to the ancient custom established in this province," if interpreted according to their literal acceptation, create no community with respect to lands owned at the celebration of the marriage. They contain the sense and meaning of the "ancient custom," and must be construed in reference to it. The 220th article of the Custom of Paris says, "*que homme et femme conjoints ensemble par mariage, sont communs en biens meubles et conquets immeubles faits durant le*

*mariage.*" If they contracted with reference to the custom of Paris, and if, by that custom, immovables owned at the time of the celebration of the marriage did not enter into the community, the ground is not perceived on which those words can be construed as a stipulation that such lands should be divided as partnership property, at the dissolution of the community. It was certainly competent for the parties to make such an agreement, but, to say that it was done, we must maintain that they made a contract contrary to that which they declared they were making.

2. Another stipulation in the contract is, that the said future spouses take each other, with their property and the rights now actually belonging to them, and also those which may fall to or appertain to them, as well by inheritance, donation, legacy, or otherwise, which property, in whatsoever manner and from whatsoever source it may accrue, shall wholly enter into and become a portion of the aforementioned and agreed upon community of property, without any reservation. By the custom of Paris, " *Tous les immeubles, que les conjoints possédent avant la célébration du mariage, soit propres soit acquets n'entrent point en communauté, sinon pour la jouissance ; mais les acquisitions d'immeubles faites devant le mariage y entrent.*" Law of Notaries, 1 vol., 246–7. As the marriage contract was made with an eye to the custom of Paris, and as by that custom lands owned by the parties at the celebration of the marriage did not enter into community, the words " which property," in the above clause of the marital contract, must be understood as applicable only to that which came to them during the marriage. The argument, which has been made in relation to the other words of the contract, applies to the clause now under consideration. Under this view of the subject, on the dissolution of the community, by the death of J. B. Vifvarenne, the entire lot in controversy descended to his heirs.

3. By the Spanish law, which formerly prevailed here, if a person, who marries a second time, has children of his or her

preceding marriage, he or she cannot, in any manner, dispose of the property given or bequeathed to him or her by the deceased spouse, or which came to him or her from a brother or sister of any of the children which remained. This property, by the second marriage, becomes the property of the children of the preceding marriage, and the spouse who marries again only has the usufruct of it. But if the children and their forced heirs die before their parents, the property so inherited by them belongs to the surviving parent. *Lablanc* v. *Landry*, 7 Mar. Lou. N. S. 665.

4. An exception to this rule was created in favor of women becoming widows before the age of majority, which was twenty-five years, although they should marry a second time. *Duncan's Ex.* v. *Hampton*, 6 Martin's La. Rep. N. S. 31. The general rule being against second marriages, on principle, the widow must show herself within the exception. This rule is of universal application in criminal and civil cases, and no reason is perceived which exempts this widow from its operation. Even in drawing an indictment of a capital offence, an exception not in the enacting clause of a statute need not be negatived, but the party relying upon it must show himself entitled to its protection. Numberless other instances might be enumerated, but this is deemed sufficient.

5. By the ancient Spanish law of succession, which once prevailed here, where there were no descendants, the ascendants were preferred to the collaterals. The father and mother succeeded to their child in preference to brothers and sisters or other collaterals. 2 Cond. Lou. Rep. 330. 2 Partidas, 1099, 1100.

Under the Spanish law, illegitimate children could not inherit the estate of their fathers or grandfathers, nor other relations descending from them. 1 Partidas, 551.

The twelfth section of the act 4th July, 1807, enacts, that there shall be no distinction in the distribution of any intestate's estate, between kindred of the whole or half blood, unless when the inheritance came to the said person so seized by descent,

demise, or gift, of some one of his or her ancestors, in which case all those who are not of the blood of such ancestors shall be excluded from such inheritance.

Louis Vifvarenne dying in 1813, and having received the land by descent, from his father, his estate, under this law, descended to his blood on the part of the father. The law intended that the estate should continue in his blood from whom it was originally derived. Brothers of the half blood being nearer in degree than uncles and aunts on the part of the mother, and they being excluded, there can be no pretence in saying that maternal uncles and aunts are let into the inheritance. They are no more of the blood of the father, J. B. Vifvarenne, than the brothers and sisters of half blood on the part of the mother ; and to maintain that they should inherit, when brothers of the half blood were excluded, would overturn all our notions of the canons of descent. Besides, by the fourteenth section of the act last recited, brothers and sisters are preferred to any kindred more remote than they are. If more children than one survived their father, Vifvarenne, and died before their mother, his inheritance would descend to her, if she became a widow under twenty-five years of age ; otherwise, she would only have the usufruct of it during her life, and on her death it would go to her son by Vifvarenne, because it came by descent from his father.

6. It may be taken as an established principle of law, that a certified copy of any record or public paper, by the officer entrusted with its custody, is evidence, if the original would be. Copies of the registries of marriages, births, and burials, are evidence of what they purport to record : namely, that certain persons, there described, were married, born, or buried, at a particular time or place, but they are not evidence of any other facts inserted in them, as of the time or place of the birth of an infant. 2 Phil. 284. An entry in a register of christenings, stating the year of the birth, is not evidence in support of a plea of infancy ; and the mere entry of christening, unaccompanied by any evidence showing that the person was young at the time

of christening, does not prove the fact of birth in the parish. 1 Phil. 410. So Greenleaf, speaking of entries made in discharge of official duty, says, that, to be admissible, they must be such as it was the person's duty to make, or which belonged to the transaction as part thereof, or which was its usual and proper concomitant. They must speak only to those things which it was his business or duty to do, and not to extraneous and foreign circumstances. Section 115.

We are not familiar with the old Spanish law with respect to the inventory, appraisement, and sale of the effects of deceased persons. Under our law, the mention of the wife and children would be unnecessary and irrelevant. But these official acts, preserved, as they have been, would seem to be evidence of what was required under the Spanish law. We may presume, that the officers under that law acted as they were required, where it does not appear to the contrary. *United States* v. *Percheman*, 7 Pet. Rep. 51. If so, there would be no violation of the principles above stated, in receiving them as evidence of the facts stated in the fifth and eleventh instructions of the defendant below. As letters testamentary are evidence of the death of the intestate, there would seem to be no impropriety in permitting the inventory and appraisement, under the Spanish law, to have the same effect.

7. With regard to the certificate of the burial of Louis, there is more difficulty. In England, where there is an established church, recognized by law, which had authority to legislate with respect to parochial registers of births, deaths, &c., the domestic registers of that kingdom, made and preserved by the clergy of the established religion, were deemed authentic, and copies of them, duly proved, were always admissible. But registers kept by dissenters were not deemed authentic; nor were foreign registers so treated, unless the law was shown which authorized them. In this state, where there is no religion established by law, all church registers, like those of the dissenters in England, and foreigners, are unauthentic and not regarded as public documents in our courts. This would seem to be the principle when uninfluenced by statute. In order to

give in evidence an examined copy or certified extract from a foreign register, it would appear to be necessary to prove that the register is, according to the law of the country, a document of an authentic and public nature. Hubback on Evidence of Succession. Dissenters' registers and the registers of burials in a foreign convent were rejected, when offered in evidence of the death of a person. Ib. 161. The act of 17th January, 1831, is the first which makes registers of births, &c., kept in pursuance of the rules and ordinances of the churches and religious societies in this state, evidence. We do not see, upon reference to our books of reports, that any question arose as to the admissibility of registers before the passage of this act. The authenticity of registers kept in Louisiana, by the Catholic church, is not shown. We should presume the law to be, in that state, as it would be here without any statutory enactment, as she has no church established by law. It is true, that the priest of the parish of St. Landry testified that the church enjoins the keeping of such registers, but still it does not appear that they are recognized as authentic by the civil law of the country. An act of the 10th April, 1811, requires the judge of the parish to keep a register of births and deaths, and prescribes what they shall contain. Bullard & Catry's Dig. 1 vol. 44.

It seems that the admissibility of the facts recited in these registers, should depend upon the terms of the authority by which they are required to be kept. The question upon them will be, what facts are required to be stated? In this case, the priest testified, that it is required by the rules of the Catholic church, that the parentage of the deceased should be stated in the register of deaths. So, the act above cited, of the territory of Louisiana of the 10th April, 1811, directs that the records shall contain, as far as the same may be ascertained, the Christian names, profession, and residence of the father and mother of the deceased, and the place of his or her birth. From the testimony in the cause, it would appear that the same requirements are exacted by the Catholic church from the priests in that state.

In every parish in Spain, the vicar or curate, or if there be

none, the rector, is charged with the care of the parochial archives. The register of deaths contains the name, age, birthplace and parentage of the deceased; the day of death, place of residence, whether married or single, and to whom married, and whether testate or intestate. Hubback, 520. In France, the registration of births, deaths, and marriages is committed to the civil power, and great care is taken to insure the accuracy of these records. The entries contain more particulars than are required in most other countries. Ibid.

8. The ground is not perceived on which this certificate is admissible as evidence of pedigree. It may be conceded, that death, marriage, birth of a child, dates of these events, age, legitimacy, relationship generally, are provable by hearsay, on questions of pedigree. So, the recitals of these facts in family deeds may be evidence on such questions. Hubback, 649. Ibid, 69. Hearsay, admitted as evidence in questions of pedigree, must proceed from relatives. Ibid, 652. Greenleaf, 103–4. Evidence of the declarations of a clergyman, as to the fact of marriage, has been held to be admissible; so of those of midwife. Hub. 655–6.

The first instruction of the plaintiff below did not state the Spanish law correctly, in saying that the widow should restore the inheritance to the children of the first husband living at the time of such second marriage, because, by that law, the widow had the usufruct of the inheritance during her life, notwithstanding her second marriage. It is not perceived, however, in what manner this error could affect the verdict. The error seems to have been an immaterial one, as the usufruct for life of the widow ceased, by reason of her death, in November, 1792.

The court should not have given the third instruction asked by the plaintiff below, nor have refused the fifth, sixth, and eleventh asked by the defendants.

Judge Ryland concurring, the judgment of the court below is reversed, and the cause remanded. Judge Gamble not sitting in the cause.